# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 16-1461V
Filed: October 18, 2018
PUBLISHED

| | |
|---|---|
| GAIL DIRKSEN,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages;<br>Decision on the Written Record;<br>Influenza (Flu) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA) |

*Shealene Priscilla Wasserman*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Lara Ann Englund*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On November 4, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury caused by her November 7, 2013 influenza ("flu") vaccination. Petition at 1-2. The case was assigned to the Special Processing Unit of the Office of Special Masters and the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for a Shoulder Injury Related to Vaccine Administration or "SIRVA." For the reasons discussed below, the undersigned now finds that petitioner should receive compensation in the amount of **$86,784.56**.

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I.     Procedural History

On November 4, 2016, along with her petition, petitioner filed medical records marked as exhibits 1-4. (ECF No. 1.)  However, petitioner did not file a statement of completion until December 19, 2016. (ECF No. 9.)  Subsequently, during the initial status conference held January 13, 2017, additional outstanding medical records were identified. (ECF No. 11.)  Additional records and an amended statement of completion were filed on February 27, 2017. (ECF Nos. 12-13.)

On April 28, 2017, respondent filed his Rule 4(c) Report. (ECF No. 17.) Respondent recommended against compensation in this case. (*Id.*) Respondent argued, *inter alia*, that the evidence was insufficient to show a logical sequence of cause and effect or a temporal relationship between vaccination and injury because petitioner did not seek medical attention for her shoulder injury until nearly four months after her vaccination, the injection site was not included in her vaccination record, and she did not adequately describe to her doctors the relationship between her vaccination and her shoulder pain. (*Id.*, p. 4.)

Additional records were filed on May 23, 2017. (ECF No. 19.)  Thereafter, following a status conference held by the staff attorney managing this case, the undersigned concluded that the case was ripe for a fact hearing. (ECF No. 20.)  In preparation for the hearing, petitioner filed additional evidence on August 30, 2017, September 8, 2017, and September 11, 2017. (ECF Nos. 25, 27-28.)

A fact hearing was held in Washington, D.C., on September 14, 2017. (*See* Transcript of Proceedings ("Tr.") at ECF No. 42.)  Petitioner was the sole witness. At the conclusion of the hearing, the undersigned informed the parties that she intended to issue a preliminary ruling from the bench. (Tr. 51-52.)  The parties consented. (Tr. 52.) The undersigned stated that her ruling would resolve (1) the site of administration of petitioner's vaccination, (2) whether the onset of petitioner's symptoms occurred within 48 hours of vaccination, and (3) whether petitioner sustained a shoulder injury related to vaccine administration ("SIRVA").  (Tr. 52-53.)  Subsequently, on November 6, 2017, the undersigned issued a Ruling on Entitlement finding petitioner entitled to compensation for SIRVA. (ECF No. 48.)

The parties attempted to informally resolve the appropriate amount of compensation for petitioner's damages, but advised the undersigned on January 26, 2018, that they had reached an impasse.  (ECF No. 59.)  Respondent rejected the undersigned's suggestion that the parties pursue mediation (ECF No. 64); however, in a status conference held with the staff attorney managing this case, the parties advised that they were both amenable to proceeding to a decision by the undersigned based on the written record (ECF No. 60). Petitioner, however, wished to file additional evidence. (ECF No. 60.)

Subsequently, petitioner filed updated medical records along with an affidavit by petitioner regarding her pain and suffering and three family fact witness affidavits also

addressing petitioner's pain and suffering. (ECF Nos. 66-68, 71.) Petitioner filed a statement of completion on July 6, 2018. (ECF No. 72.)

On July 6, 2018, petitioner confirmed that the parties had reached an agreement with regard to the amount of petitioner's past unreimbursable medical expenses. (ECF No. 73.) The parties submitted simultaneous briefs regarding the appropriate amount of compensation in this case on August 8, 2018. (ECF Nos. 75-76.)[3]

This case is now ripe for resolution. Petitioner seeks compensation for the stipulated amount of prior medical expenses as well as past and future pain and suffering. (ECF No. 77.) Petitioner makes no claim for lost wages.

## II.     Factual History

On November 7, 2013, petitioner received a flu vaccination in her left shoulder. (Ruling on Entitlement, p. 3.) At the time of her vaccination, petitioner was living in North Dakota. She previously lived in California.

Prior to receiving this vaccination, petitioner had no prior history of left shoulder problems. (*Id.*) She experienced pain within 48 hours of her vaccination. (*Id.*) Specifically, petitioner testified that she experienced soreness the day of her vaccination, but that "the next morning when I woke up, it was like somebody had knuckle-punched me and I noted it was hard to lift my arm completely up." (Tr. 9.) Petitioner indicated that the soreness continued to increase over subsequent days. (Tr. 10.)

Over the following month, she described her shoulder as becoming "locked." (Tr. 12.) She indicated that she could not lift her arm straight up or put her arm straight out to the side. (*Id.*) She had difficulty lifting things, showering, and getting dressed. (Tr. 11-12.) During this period, petitioner treated her injury at home using ibuprofen as well as heat and ice. (Tr. 13-14.) She indicated that she was "very protective of my left shoulder and couldn't use it for much of anything at that point."[4] (Tr. 18.)

Nonetheless, petitioner did not seek treatment until she went to her chiropractor on February 5, 2014. (Tr. 14.) Petitioner indicated that she delayed seeking treatment both because of the holiday season and because during that period she began having problems with her dental bridge, a problem which she prioritized. (*Id.*) Petitioner testified that her bridge came loose on Christmas day. (Tr. 14.) Petitioner's bridge repair included an additional complication in that she was living in North Dakota at the time, but her dentist was located in California where she previously lived. Petitioner testified that she returned to California for her dental care both because she trusted her

---

[3] Petitioner subsequently refiled her brief on August 9, 2018. (*See* ECF No. 77.)

[4] Petitioner also submitted witness affidavits by Patricia Ordahl (Pet Ex. 11) and Ann Spurgeon (Pet Ex. 12). These affidavits were filed as evidence regarding the onset of petitioner's condition. The undersigned notes, however, that these affidavits include some observations regarding the fact of petitioner's pain and suffering from November of 2013 through January of 2014.

dentist and because the bridge was under warranty with him. (Tr. 14-15.) Petitioner's chiropractor was also located in California. She visited him while she was in California for her dental repair.

Petitioner presented to her chiropractor on February 5, 2014, complaining of left shoulder pain and decreased range of motion. (Pet Ex. 6, p. 8; Pet Ex. 10, p. 1.) Petitioner was treated with "inferential therapy" and ice. She received manipulation of the C5 and T4 vertebrae, but the chiropractor left the shoulder alone due to the degree of discomfort petitioner demonstrated. (Pet Ex. 10, p. 1.)

Subsequently, on March 4, 2014, petitioner was seen by a physician assistant at the Sanford Walk-In clinic in Minot, North Dakota, with a chief complaint of left shoulder pain. (Pet Ex. 2, pp. 6-8.) Petitioner did not yet have a primary care physician in North Dakota. (Tr. 26.) At the Sanford Walk-In Clinic, petitioner reported that when she moved her arm "it feels like she gets a Charlie horse." (*Id.* at 6.) Petitioner described the pain as "intense spasms and aching." (*Id.* at 7.) She reported "internal rotation and movement above head increases the pain" and that "she has full strength when working below shoulder height but cannot use arms [above] shoulder height." (*Id.*) It was noted that petitioner's chiropractic visit had failed to resolve her pain and that ibuprofen provided some relief but does not resolve the pain. (*Id.*) Petitioner was not experiencing any numbness or tingling down her arm. (*Id.*) Physical exam confirmed a decreased active range of motion, including "limitation of abduction and flexion above shoulder height, internal rotation limited to belt line," as well as pain with internal and external rotation and with palpation over the deltoid and superior aspect of the lateral shoulder."[5] (*Id.* at 8.) Petitioner was prescribed hydrocodone-acetaminophen for pain relief, referred for a further orthopedic evaluation, and recommended physical therapy, which she declined.[6] (*Id.*)

On April 21, 2014, petitioner consulted orthopedic surgeon Dr. Ravindra Joshi. (Pet Ex. 3, pp. 7-9, 11.) Her chief complaint was a "painful and stiff left shoulder." (*Id.* at 7.) She reported that "[t]he pain is exacerbated with any attempt at overhead activity, relieved by rest, and a dull ache in character. The pain intensity is 6/10 with overhead activity." (*Id.*) Physical exam confirmed tenderness over the subacromial space with palpation and that, consistent with adhesive capsulitis or frozen shoulder,"[n]o

---

[5] Respondent stresses that the record of petitioner's March 4, 2014 evaluation indicates that she reported no known injury and rated her pain as a "0" on a "0-10" scale. (ECF No. 27, p. 2.) Petitioner testified, however, that when she reported no known injury, she was referring to a traumatic injury or accident, such as from lifting or falling. (Tr. 21.) The undersigned finds this to be a reasonable explanation. Additionally, the undersigned does not find the notation of "0" pain to be significant evidence. This notation is not consistent with the more detailed statements recorded by the physician assistant within the same record nor with the physician assistant's own findings on physical exam. The undersigned finds these other aspects of petitioner's medical record to be better evidence of petitioner's condition at the time.

[6] Petitioner testified that at that time she "didn't want anyone touching my arm." (Tr. 21.)

movements are possible in the glenohumeral joint." (*Id.* at 8.) It was also noted that petitioner "is able to actively forward elevate only up to 60; beyond that she gets severe stiffness in the left shoulder." (*Id.*) X-ray imaging showed "slightly reduced acromiohumeral distance with a type 2 acromion." (*Id.*) Petitioner was diagnosed as having a left frozen shoulder. (*Id.*) The orthopedic surgeon recommended manipulation under anesthesia and further indicated that "[a]t this stage physical therapy is not recommended as it will be extremely painful and the patient will not regain any range of motion unless the adhesions are released under anesthesia."[7] (*Id.* at 9.)

Petitioner testified that she was uncomfortable with the potential complications Dr. Joshi discussed regarding manipulation under anesthesia and opted to pursue physical therapy instead. (Tr. 22.) Thereafter, in May of 2014, petitioner attended four physical therapy sessions on a self-referral basis.[8] (Pet Ex. 4.) Petitioner explained to her physical therapist that she did not want to pursue the recommended shoulder manipulation, but that she was still considering a cortisone injection and was interested in learning to do exercises. (Pet Ex. 4, p. 1.) Petitioner reported that daily ibuprofen was continuing to assist with her shoulder pain.[9] (*Id.*) On May 2, 2014, petitioner initially reported a pain level of 4/10 with pain of 8/10 with internal rotation. (*Id.*) She demonstrated left shoulder flexion of 80 degrees, 87 degrees abduction, neutral internal rotation, and 80 degrees of external rotation with the shoulder abducted 45 degrees to the back of the head. (*Id.*)

On May 5, 2014, petitioner reported aching pain of 5/10, with highest pain at 8/10, but she was noted to have "significant improvement in range of motion." (Pet Ex. 4, p. 9.) By May 7, 2014, petitioner had flexion of 126 degrees in standing and abduction of 121 degrees in standing. (*Id.* at 3.) Petitioner was noted to be compliant with her home exercise program. On May 14, 2014, petitioner reported pain of 3-4/10 when working, rising to 7/10 at its highest. (*Id.* at 4.) Further improvement in range of motion was noted, with flexion of 134 degrees and external rotation of 132 degrees noted. (*Id.*) The physical therapist noted that "[a]ll left shoulder motions have improved from last week." (*Id.*) It was noted that "[t]he patient has again made significant improvements in range of motion due to the patient's compliance of the home exercise program and of stretching the left shoulder frequently throughout the day." (*Id.*)

---

[7] In her brief, petitioner incorrectly states that physical therapy was recommended. (ECF No. 77, p. 3.)

[8] Respondent's brief incorrectly states that she had three physical therapy sessions. The records reflect sessions occurring May 2, May 5, May 7, and May 14. (*See* Pet Ex. 4, p. 9.)

[9] When she first reported her shoulder pain to the Sanford Walk-In Clinic, petitioner indicated that she was taking 800 mg of ibuprofen twice daily for pain. (Pet Ex. 2, pp. 6-7.) That record indicated that the ibuprofen helped alleviate the shoulder pain, but did not explicitly indicate that the ibuprofen was taken exclusively for shoulder pain. (Id.) The physical therapy note indicates that the ibuprofen was primarily taken for cervical arthritis, but that it also helped control the shoulder pain. (Pet Ex. 4, p. 1.)

However, petitioner did not return to physical therapy after that visit and was discharged on July 23, 2014. (*See, e.g.,* Pet Ex. 4, p. 9.) Petitioner testified that "[t]he physical therapist said I was doing so well and she thought I could just continue on with the exercises that she had given me to do at home."[10] (Tr. 23.)

Petitioner did not return for further treatment of her shoulder injury until she had a follow up with Dr. Joshi on June 3, 2015.[11] (Pet Ex. 3, pp. 1-2.) With regard to petitioner's left shoulder (she also presented with a new complaint of right forearm pain), Dr. Joshi recorded that:

> The patient continues to have pain and stiffness in the left shoulder. The pain is exacerbated with overhead activity, relieved by rest, and a dull ache in character. The pain intensity with overhead activity is about 6/10. The patient has been taking over-the-counter anti-inflammatory medication, however, her symptoms are persistent.

(Pet Ex. 3, p. 1.)

Dr. Joshi observed that "[o]n palpation the patient has tenderness over the subacromial space with positive impingement test with restricted range of motion beyond 60 degrees of forward elevation." (Pet Ex. 3, p. 1.) Dr. Joshi opined that petitioner's exam remained "consistent with frozen shoulder." (*Id.*) He recommended that petitioner return to physical therapy for "strengthening, stretching, and mobilization," but noted that if petitioner "continues to have significant and persistent stiffness, she may need manipulation under anesthesia." (*Id.* at 2.) There is no evidence in the record indicating that petitioner pursued this recommended physical therapy. Petitioner had indicated to Dr. Joshi that she planned to move back to California. He recommended that she follow up with an orthopedist in California as soon as possible to review how she responds to the conservative line of treatment. (*Id.*)

Petitioner's left shoulder condition is not referenced in her medical records again until she established care with Dr. Jennifer Bard in Clackamas, Oregon, on March 8,

---

[10] Citing petitioner's Exhibit 4 generally, respondent contends that petitioner was discharged from physical therapy "for failure to attend." (ECF No. 75, p. 2.) Petitioner's physical therapy notes do indicate one visit scheduled for May 21, 2014, was rescheduled, but do not otherwise indicate that petitioner was discharged for failure to attend *per se*. Although it was noted in petitioner's July 23 discharge that she had not attended since the middle of May, it was also noted that "[p]atient was doing better at that last visit" and that she was "[v]ery proactive and compliant with the [home exercise plan]." The therapist noted "[u]sure whether the [long term goals] were achieved but patient had been doing well the last treatment session." (Pet Ex. 4, p. 5.) These statements in the record are consistent with petitioner's testimony.

[11] In the interim, petitioner established care with a new primary care physician on October 9, 2014, and underwent a routine annual physical. (Pet Ex. 17, pp. 1-2.) At that time, it was noted that "[s]he has a history of a frozen shoulder but it has been improving rather than worsening. She has discomfort to the shoulder and this radiates to the upper arm, to the elbow, lateral aspect on the palmar side." (*Id.* at 2.)

6

2017.[12] (Pet Ex. 18, pp. 3-4.)  At that time, the condition is described as "about 95% recovered." (*Id*. at 4.)  Dr. Bard noted "[l]eft shoulder diffusely tender with decreased [range of motion] in all directions." (*Id*.)   Under "Assessment/Plan," she noted "slow improvement of shoulder pain." (*Id*.)

On April 4, 2017, petitioner returned for a physical exam with a physician assistant.  (*Id*. at 7-11.)  Under musculoskeletal range of symptoms, petitioner was noted as positive for left shoulder pain "intermittently." (*Id*. at 8.)  Her left shoulder was noted to be tender to palpation anteriorly, but range of motion was noted to be within normal limits. (*Id*. at 9.)  Physical therapy was recommended.[13]  (*Id*. at 10.)  This was petitioner's last medical appointment prior to the fact hearing held in this case on September 14, 2017.

During the hearing, petitioner demonstrated her range of motion to the undersigned.  (Tr. 46- 49.)  At that time, petitioner was able to raise her left arm from the side only to about 45 degrees above horizontal.  (Tr. 46-47.)  From the front, petitioner was able to raise her arm to about 110 degrees from the horizon. (Tr. 47.)  She indicated that when she reaches the limit of her range of motion she experiences spasms in her arm and shoulder. (*Id.*)  Attempting to reach around to her upper back, petitioner was only able to reach her waistline. (Tr. 48.)

Shortly after the hearing, on September 18, 2017, petitioner called Dr. Bard to request a referral for physical therapy. (Pet Ex. 18, p. 16.) Petitioner attended twenty-seven sessions of physical therapy from September 27, 2017, through February 27, 2018. (Pet Ex. 22, pp. 1-14; Pet Ex. 23, pp. 1-15; Pet Ex. 3, pp. 2-8.)  At her initial evaluation, petitioner reported that her frozen shoulder "has gotten somewhat better through previous PT," but she "continues to have deficits." (Pet Ex. 22, p. 13.)  Petitioner's pain level was recorded as ranging from 6/10 to 9/10. (*Id*.)  She was found to have moderate weakness and severe difficulty lifting heavy objects, unable to lift greater than 20 pounds. (*Id*.)  She had "fair" movement quality, able to perform three of five critical elements of overhead reaching. (*Id*.)  Her left shoulder active range of motion was 115 degrees flexion and 124 degrees abduction. (*Id*.)  At a reassessment

---

[12] In his recitation of petitioner's medical history, respondent notes that petitioner had a number of intervening medical appointments during which her shoulder condition is not referenced. (ECF No. 75, p. 3.)  Specifically, petitioner was seen for an upper respiratory infection on June 4, 2015. (Pet Ex. 2, pp. 11-13.)  On October 27 and November 16, 2015, she was seen for a rash and congestion. (Pet Ex. 19, pp. 1-4.)  On January 5, 2016, she had a wellness check-up. (Ex. 21, pp. 10-11.)  At that visit, the examination record states there were no upper extremity limitations or pain with range of motion. (*Id*.)  Petitioner had a mammogram on January 20, 2016, and a colonoscopy and polypectomy on January 25, 2016. (Pet Ex. 20, pp. 20-21, 96-113.)  On July 18, 2016, petitioner had a follow up for her abnormal colonoscopy and high cholesterol without mention of her shoulder symptoms. (Pet Ex. 21, pp. 1-2.)  During this period, petitioner moved from North Dakota to Idaho rather than California as she had suggested to Dr. Joshi and later to Oregon.  (Tr. 30.)

[13] Petitioner testified that she did not pursue the recommended physical therapy because both she and her husband were unemployed at the time. (Tr. 26.)  Subsequent to the hearing, however, she did request a physical therapy referral from Dr. Bard. (Pet Ex. 18, p. 16.)

conducted February 22, 2018, petitioner was reported to have made "exceptional progress." (Pet Ex. 33, p. 4.) The therapist noted that petitioner "has achieved the short term therapy goals and is progressing according to the plan of care." (*Id.*) Continued physical therapy was recommended. (*Id.*) At her February 27, 2018 session, the most recent session included in the records filed in this case, petitioner reported that "she is doing pretty well, but still feels weaker on her left side and lack of mobility in [internal rotation]." (Pet Ex. 33, p. 8.)

On April 19, 2018, petitioner was evaluated by orthopedist Tony Lin, M.D. (Pet Ex. 34.) He recommended an MRI which was completed on April 24, 2018. (Pet Ex. 34; Pet Ex. 35.) The record of the MRI is of poor quality and difficult to read; however, the undersigned agrees with respondent's representation that the study indicates, *inter alia*, "no findings to suggest adhesive capsulitis." (Pet Ex. 35; ECF No. 75, p. 4.)

No further medical records were filed; however, petitioner filed an affidavit addressing her pain and suffering.[14] (Pet Ex. 26.) Petitioner averred that the first eight months following her vaccination were the most painful, with her shoulder being 100% frozen during that period. (Pet Ex. 26, p. 1.) Petitioner indicated that during that time she had to compensate for her frozen shoulder using the rest of her body. (*Id.*) She also indicated that her injury has limited her ability to paint, something which she has done as a hobby and had hoped to begin doing professionally. She indicated that her injury cut short that idea.[15] (*Id.* at 1-2.) Petitioner continues to paint, but is limited to painting on lighter weight surfaces that she can move on her own. (*Id.* at 2.) She also avers that the injury has interfered with her ability to seek part-time work to help support her and her husband's early retirement years. (*Id.*) Petitioner described difficulty with certain everyday tasks, especially when her husband is not around, as well as difficulty lifting her grandchildren and pets. (*Id.* at 2-3.) Petitioner also explained that when they moved into their current home, petitioner and her husband remodeled their kitchen[16] and laundry area around her limitations. (*Id.* at 3.) Despite continued physical therapy, petitioner believes her injury will likely persist for the rest of her life. (*Id.* at 1, 3.)

Petitioner also filed witness statements by her sons Ryan and James as well as her husband, Don, regarding her pain and suffering. (Pet Exs. 24, 25, and 32.) Ryan Dirksen noted that his mother has had difficulty holding her grandchildren and noted her difficulty during Christmas of 2013 in particular. (Pet Ex. 24.) He indicated that he

---

[14] Petitioner also previously filed two affidavits which address her pain and suffering at least in part. (*See* Pet Ex. 7; Pet Ex. 15.) These prior affidavits largely address the course of petitioner's condition through about June of 2015 and on the whole are consistent with the above-described history.

[15] Petitioner filed photographs of some of her work. (Pet Exs. 13-14.) She explained that she painted murals and put decorative finishes on furniture. Pet Ex. 26, pp. 1-2; Tr. 35-36. Of note, however, petitioner has not alleged a lost wages claim.

[16] Petitioner filed documentation illustrating the ADA compliant appliances that petitioner installed in her kitchen as a result of her condition. Petitioner has not pursued reimbursement of the cost of the kitchen modifications or the appliances.

understands petitioner's difficulties because of his own struggles as a disabled veteran. (*Id.*) James Dirksen recalled a specific incident in which flipping a light switch caused petitioner to call out in pain. (Pet Ex. 25.) He also averred that he has helped her on many occasions to lift objects or perform simple tasks such as reaching high shelves or removing a coat. (*Id.*) Don Dirksen averred that his wife has a high tolerance for pain, but that since her injury she has become more dependent upon him. (Pet Ex. 32.) He indicated that she has gotten a little better, but that she still has many limitations. (*Id.*)

### III. Party Contentions

Petitioner argues that she should be awarded $106,784.56 in compensation for her damages, representing $100,000.00 in compensation for past pain and suffering, $5,000.00 in future pain and suffering for the year following this decision (reduced to a net present value of $4,950.00), and $1,784.56 in compensation for past medical expenses.[17] (ECF No. 77, p. 4-5, 8.) Petitioner asserts that "[p]etitioners in the Vaccine Program with analogous SIRVA injuries are routinely awarded comparable damages to what Ms. Dirksen is seeking for her personal pain and suffering." (*Id.* at 5.)

In particular, petitioner compares the instant case to two prior cases in which damages were decided by the undersigned and one additional case in which damages were proffered by the government. Specifically, petitioner cites: *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); *Marino v. HHS,* No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); and *Benincasa v. HHS*, No. 16-179V, 2016 WL 8193000 (Fed. Cl. Spec. Mstr. Oct. 17, 2016) (awarding $101,316.64 based on respondent's proffer).[18]

---

[17] The total award proposed by petitioner would be $106,734.56 after adjusting for petitioner's net present value calculation.

[18] Petitioner briefly discusses certain facts of the *Benincasa* case; however, these facts are not publicly disclosed in either the decision awarding damages in that case or in the prior ruling on entitlement and therefore will not be repeated herein. *See* 2016 WL 6472964; 2016 WL 8193000. Petitioner's counsel presumably has access to these underlying facts because the *Benincasa* petitioner was represented by her firm. In *Kim v. HHS,* No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018), the undersigned explained that

> [W]hile the undersigned appreciates the rationale behind citing selected prior proffered awards, the usefulness of these citations *without more* is minimal. This approach has several significant limitations and becomes less persuasive as additional reasoned decisions become available. First . . . awards based on stipulations and proffers may include additional elements of damages, such as lost wages or medical expenses, that are not clearly communicated by the negotiating parties. Moreover, notwithstanding the representations made in the party briefs regarding the merits of these prior cases, the facts of these individual cases are not a part of the record of this case nor are they disclosed in the cited decisions. Third, the scale of the . . . history of prior SPU SIRVA awards (864 such awards in four years) is such that petitioner's [individual] citations, even assuming *arguendo* that they are very well matched to the facts of the instant case, necessarily represent "cherry picking."

9

Respondent agrees that petitioner should be awarded $1,784.56 for unreimbursed medical expenses, but contends that $57,500.00 would be a more appropriate amount of compensation for petitioner's pain and suffering. (ECF No. 75, p. 6.)  Respondent stresses that there are "large gaps" in petitioner's treatment history and that this reflects that "her clinical course did not necessitate immediate or consistent, ongoing treatment."  (*Id.* at 6-7.)  Respondent argued that his proposed award is reasonable in light of five prior decisions by the undersigned addressing pain and suffering in SIRVA cases, but did not specifically compare the instant case to any of those cases.  Specifically, respondent cited and described the same *Dhanoa* and *Marino* cases cited by petitioner, as well as: *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses), *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses), and *Collado v. HHS*, No. 17-225, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in umreimbursable medical expenses).  (*Id.* at 7-8.)

## IV.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).  Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro v. HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. HHS,* No. 04- 1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[19]  *See I.D.*, 2013 WL

---

2018 WL 3991022 at *9 (emphasis original).

[19] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

10

2448125, at *9; *McAllister v. HHS,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g. Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009)(finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.") And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[20] *See Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. HHS*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

In that regard, the undersigned notes that over the past four years the Special Processing Unit has amassed a significant history regarding damages in SIRVA cases. In *Kim v. HHS*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. 2018 WL 3991022, at *6. The undersigned noted that the median award for cases resolved via government proffer is $100,000.00 and the median award for cases resolved via stipulation by the parties is $71,355.26.[21] *Id.* The undersigned noted that "to the extent prior informal resolutions

---

[20] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases have remained on the undersigned's docket.

[21] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. 2018 WL 3991022 at *6. Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id.* The undersigned noted that "These figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id.*

are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case." *Id.* at *9.

Additionally, since the inception of SPU in July 2014, there have been several reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering. In addition to the five cases cited by the parties (*Desrosiers*, *Dhanoa*, *Knauss*, *Collado*, and *Marino*), the undersigned also issued reasoned damages decisions in the above-discussed *Kim* case as well as *Dobbins v. HHS*. *See Kim*, 2018 WL 3991022 (awarding $75,000.00 for pain and suffering and $520.00 for medical expenses) and *Dobbins*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for medical expenses).

## V.     Discussion

As compared to other SIRVA claims, the instant case is notable for the significant gaps in petitioner's treatment. In that regard, the undersigned notes respondent's argument that these gaps show that "her clinical course did not necessitate immediate or consistent, ongoing treatment." (*Id.* at 6-7.) That is, petitioner waited three months before seeking any type of treatment for her condition (limited to a chiropractic visit on February 5, 2014) and over five months before seeking any orthopedic opinion (visit to Dr. Joshi on April 21, 2014). Petitioner then attended only four physical therapy sessions (May 2, 5, 7, and 14, 2014) before waiting a further year before seeking any follow up treatment (return to Dr. Joshi June 3, 2015). After one orthopedic follow up, petitioner waited again about a year and a half before seeking any additional treatment (when establishing care with Dr. Bard on March 8, 2017). Despite being recommended physical therapy on April 4, 2017, petitioner still waited five more months before returning to physical therapy on September 27, 2017. It was only at that time, nearly four years after her injury-causing vaccination, that petitioner attended a significant course of physical therapy (27 sessions as of petitioner's last filing).

Although there are mitigating factors suggested within the record, such as petitioner's health insurance status, her dental work, and multiple interstate relocations, these factors do not fully explain petitioner's pattern of treatment. Moreover, the record overall reflects that petitioner's actual condition likely factored into the course of her treatment. For example, after just four physical therapy sessions in May of 2014 and just prior to a one year gap in treatment, petitioner was discharged from physical therapy after it was noted that petitioner was "doing well." (Pet Ex. 4, p. 5.) Petitioner testified that "I was doing so well [the physical therapist] thought I could just continue on with the exercises she had given me to do at home." (Tr. 23.) By the time petitioner

subsequently established care with Dr. Bard in March of 2017, her condition was characterized as "about 95% recovered" when her only treatment to that point had been ibuprofen, home exercises, and four sessions of physical therapy. Following her extended course of physical therapy from September 27, 2017 to February 27, 2018, petitioner's MRI showed no signs of adhesive capsulitis, though other findings were noted. (Pet Ex. 35.)

These facts suggest that the severity of petitioner's SIRVA was mild to moderate. Indeed, the undersigned has repeatedly held that while a delay in seeking treatment for a SIRVA does not necessarily defeat petitioner's claim on causation, it is a relevant consideration in determining the degree of petitioner's pain and suffering. *See, e.g. Marino*, 2018 WL 2224736, at *8 (stating that "[t]he fact that Ms. Marino delayed seeking treatment is relevant to the value of her claim, [but] does not defeat her claim."); *accord Cooper v. HHS*, No. 16-1387V, 2018 WL 1835179 (Fed. Cl. Spec. Mstr. Jan. 18, 2018 (noting that "the undersigned does not find a delay in treatment of several months to be dispositive in and of itself regarding the question of onset in a SIRVA case such as this.").

Nonetheless, there is also significant evidence demonstrating that petitioner endured her SIRVA for an extended period and experienced ongoing deficits throughout the four years following her vaccination. Overall the record reflects eight months of significant pain and suffering from November of 2013 to May of 2014 followed by reduced sequela continuing until about April of 2018. The undersigned does not find sufficient evidence on this record to award future pain and suffering.

Petitioner averred that the first eight months following her vaccination were the most painful. (Pet Ex. 26, p. 1.) This is largely consistent with her medical records. Petitioner first consulted her orthopedist on April 21, 2014 (about five months post-vaccination). (Pet Ex. 3, pp. 7-9, 11.) At that time, petitioner rated her shoulder pain at 6/10 with overhead activity and physical exam was consistent with adhesive capsulitis, demonstrating "[n]o movements are possible in the glenohumeral joint." (*Id.* at 8.) During her initial course of physical therapy in May of 2014, petitioner reported pain of up to 8/10 with internal rotation. (Pet Ex. 4, p. 1.) At the last of her four May 2014 physical therapy visits, petitioner's range of motion had improved significantly, but her long term goals remained unresolved. Petitioner demonstrated ongoing deficits at the time of the hearing in this case. However, she ultimately did pursue an extended course of physical therapy after the hearing. Although petitioner's most recent physical therapy evaluation indicates some ongoing weakness and lack of mobility with internal rotation, the most recent physical therapy record characterized her as "doing pretty well" and indicated that only one more session was anticipated. (Pet Ex. 33, p. 8.) Moreover, notwithstanding that she has averred that she believes her deficits will continue

indefinitely, petitioner's April 2018 MRI demonstrated no remaining signs of adhesive capsulitis, which was the condition to which her ongoing sequela had been attributed.[22]

As noted above, petitioner cites *Dhanoa* and *Marino* as reflecting similar levels of pain and suffering. (ECF No. 77, p. 5.) Petitioner stresses that the *Dhanoa* petitioner, who was awarded $95,000.00 for pain and suffering,[23] treated her SIRVA for three years, including 13 physical therapy sessions, two steroid injections, anti-inflammatory medication and home exercises. (*Id.*) Petitioner describes the *Marino* petitioner, who was awarded $75,000.00, as having delayed treatment for seven months and having had only two treatment visits, one steroid injection, and a home exercise plan. (*Id.* at 5-6.) Petitioner stresses that she has pursued more treatment than the *Marino* petitioner and also notes that like the petitioner in *Marino* (who had to give up tennis) she has had to give up tile and mural painting. (*Id.* at 6.)

Petitioner's "extracurricular" situation is not entirely comparable to the *Marino* petitioner. In *Marino*, it was noted that petitioner had to give up tennis entirely because she was advised that she could not safely play the game due to her SIRVA. 2018 WL 2224736 at *4. Ms. Dirksen, however, has averred that she adapted rather than discontinued her painting hobby. She has modified her painting so that she does not paint heavy objects as she did previously. (Pet Ex. 26, p. 2.) Petitioner did indicate that her injury has caused her to abandon the idea of pursuing her painting as an income source (*Id.* at 1-2); however, since petitioner never began that endeavor prior to her injury, that line of reasoning is speculative. In contrast, the *Marino* petitioner did demonstrate that in addition to halting her tennis participation, her SIRVA also impacted her ability to perform her duties at work. 2018 WL 2224736 at *5. (Neither Ms. Dirksen nor Ms. Marino had a claim for lost wages.) Nonetheless, Ms. Dirksen's overall course of treatment was ultimately more extensive than that of Ms. Marino.

The instant case is somewhat similar to *Dhanoa*. However, there are some significant differences. Whereas the *Dhanoa* petitioner had two steroid injections and used a prescription anti-inflammatory (Mobic) (2018 WL 1221922 at *4-5), Ms. Dirksen used only iburprofen for pain relief. The *Dhanoa* petitioner waited four months before pursuing physical therapy. (*Id.*) Ms. Dirksen initially pursued limited physical therapy (four sessions) after waiting five months, but waited nearly four years before pursuing any significant physical therapy. Whereas the *Dhanoa* petitioner discontinued physical therapy because "it was too much to keep going twice a week" (*Id.* at 4), Ms. Dirksen testified that she initially stopped physical therapy because she was "doing so well" (Tr.

---

[22] The evidence petitioner submitted regarding her kitchen remodeling speaks to the sincerity of petitioner's belief that her injury will persist. Nonetheless, the undersigned is guided primarily by the assessments contained in petitioner's medical records. As previously noted, contemporaneous medical records generally provide the most reliable supporting documentation of a medical condition and the effect it has on an individual's daily life. *See Shapiro,* 101 Fed. Cl. at 537–38.

[23] The actual amount awarded was $94,900.99, which consisted of $85,000.00 for past pain and suffering and an award for projected pain and suffering of $10,000.00 which was reduced to net present value. *Dhanoa*, 2018 WL 1221922, at *7.

23.) Overall, the instant record suggests that Ms. Dirksen had a better outcome notwithstanding even greater gaps in formal treatment than experienced by the *Dhanoa* petitioner, albeit following a longer period of time.

## VI. Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $85,000.00 in compensation for actual (or past) pain and suffering and $1,784.56 in compensation for past medical expenses as stipulated by the parties. The undersigned makes no award for projected pain and suffering, future medical expenses, or past or future lost wages.

**Accordingly, the undersigned awards petitioner a lump sum payment of $86,784.56, representing $85,000.00 in compensation for actual pain and suffering and $1,784.56 in compensation for past unreimbursable medical expenses, in the form of a check payable to petitioner, Gail Dirksen.** This amount represents compensation for all damages that would be available under § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[24]

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　s/Nora Beth Dorsey
　　　　　　　　　　　　　　　　　　　　　　　　Nora Beth Dorsey
　　　　　　　　　　　　　　　　　　　　　　　　Chief Special Master

---

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.